# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL CASE NO. |
| v. | : | 1:14-CR-0015-AT-RGV |
| | : | |
| COLEMAN WARNOCK | : | |

## MAGISTRATE JUDGE'S
## ORDER, REPORT, AND RECOMMENDATION

Defendant Coleman Warnock ("Warnock") is charged in a six-count indictment with, among other offenses, conspiring to manufacture and possess with intent to distribute phencyclidine (PCP), in violation of Title 21, United States Code, Sections 841 and 846. [Doc. 1].[1] Warnock has filed preliminary and perfected motions to exclude DNA evidence and requests a *Daubert*[2] hearing. [Docs. 60 & 81]. The government has filed a response opposing Warnock's perfected motion, [Doc. 82], to which Warnock has filed a reply, [Doc. 85]. For the reasons that follow, it is **RECOMMENDED** that Warnock's motions to exclude DNA evidence and request for a *Daubert* hearing, [Docs. 60 & 81], be **DENIED**.

---

[1] The listed document and page numbers in citations to the record in this Order, Report, and Recommendation refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993)

## I.  PROCEDURAL BACKGROUND

On December 16, 2014, Warnock filed a "Preliminary Motion to Exclude DNA and Request for Daubert Hearing," [Doc. 60], and at the pretrial conference, the Court ordered the government to produce its expert summary to Warnock by January 7, 2015, [Doc. 63]. The Court subsequently extended the deadline to January 30, 2015, for the government to produce the expert summary and any other documents responsive to Warnock's preliminary *Daubert* motion, and granted Warnock until February 27, 2015, to perfect his preliminary motion. [Doc. 72].

The government produced its expert summary and additional responsive documents on January 23, 2015, a week before the production was due. See [Doc. 82 at 2; Doc. 82-1; Docs. 83-1 through 83-3; Doc. 85]. On February 27, 2015, Warnock sought an extension of time to perfect his preliminary *Daubert* motion, [Doc. 77], and the Court granted him until March 27, 2015, to file a perfected motion, [Doc. 78]. Warnock filed the perfected *Daubert* motion on March 27, 2015, [Doc. 81], and the government filed its response in opposition on April 10, 2015, [Doc. 82]. Warnock has filed a reply in support of his *Daubert* motions, [Doc. 85], in which he also seeks, among other things, an extension of time in which to have an expert review the government's previous production, as well as an Order directing the government to produce additional discovery related to the DNA evidence in this case, [id.].

## II.  DISCUSSION

A.  **Expert Summary under Rule 16**

Warnock first argues that the government's expert witness, James Sebestyen ("Sebestyen"), should not be permitted to testify as an expert at trial because the government has failed to comply with the disclosure requirements of Rule 16 of the Federal Rules of Criminal Procedure.  [Doc. 81 at 3–4].  Specifically, Warnock maintains that the government's pretrial disclosure does not adequately identify Sebestyen's opinions or the bases and reasons for those opinions.  [Id.].[3]  The government responds that its expert summary "amply articulates [] Sebestyen's opinions and bases and reasons for reaching th[ose] opinion[s] as required by Rule 16."  [Doc. 82 at 4].  Rule 16 of the Federal Rules of Criminal Procedure "imposes specific disclosure requirements on the government with regards to expert witnesses that the government plans to utilize at trial."  United States v. Holland, 223 F. App'x 891, 893 (11th Cir. 2007) (per curiam) (unpublished).  In particular, Rule 16(a)(1)(G)

---

[3] In his perfected motion, [Doc. 81], Warnock initially argued that the government's expert summary was also deficient under Rule 16 because it did not identify Sebestyen's qualifications, [id. at 3–4].  However, the government provided Warnock with a copy of Warnock's resume showing his credentials to testify as an expert witness in this case, see [Doc. 82-3], and Warnock's counsel has informed the Court that Warnock no longer challenges the government's expert summary on this basis.

requires the government to provide, at the defendant's request, a pretrial "written summary of expert witness testimony, including 'the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.'"  United States v. Perez-Lopez, 262 F. App'x 974, 979 (11th Cir. 2008) (per curiam) (unpublished) (quoting Fed. R. Crim. P. 16(a)(1)(G)).

The pretrial disclosure provided by the government in this case includes a laboratory report from the forensics division of the Georgia Bureau of Investigation, in which Sebestyen states his opinion that the DNA on buccal swabs collected from Warnock matches the DNA obtained from a black respiratory mask found at the scene of a former suspected PCP lab in Fairburn, Georgia.  See [Doc. 81-1]; see also [Doc. 83-2 at 31].  In support of this conclusion, the report indicates that "DNA isolation procedures" and "[a]mplification procedures" were performed on the mask, and that "electrophoretic separation" was then used to classify the amplification products.  [Doc. 81-1 at 1–2].  Specifically, the report explains that amplification procedures were conducted "for the D8S1179, D21S11, D7S820, CSF1PO, D3S1358, TH01, D13S317, D16S539, D2S1338, D19S433, vWA, TPOX, D18S51, D5S818, FGA STR loci and amelogenin locus," and that the "profile obtained from the mouth, nose and chin area of the mask [in question] matche[d] the profile of [] Warnock using the loci D8S1179, D21S11, D7S820, CSF1PO, D3S1358,

4

TH01, D13S317, D16S539, D2S1338, D19S433, vWA, TPOX, D18S51, D5S818, FGA and amelogenin."  [Id.].  Based on these procedures and findings, the report ultimately states that it can be concluded "[w]ith a reasonable scientific certainty, . . . that the DNA obtained from the mouth, nose and chin area of the mask . . . which matches [] Warnock originated from him or his identical sibling."  [Id. at 1].  In addition to the lab report, the government also produced over 100 pages of documentation related to the DNA testing in further support of Sebestyen's opinion. See [Docs. 83-1 through 83-3].

The government's pretrial disclosure offers a clear and unequivocal description of Sebestyen's opinion, along with a detailed explication of the test results and procedures upon which Sebestyen relied in forming that opinion. "Rule 16 does not mandate a comprehensive recitation of every nuance and detail that will make up an expert's testimony, or which may be drawn out on cross-examination," and "summaries with far less detail than that presented here have been held sufficient under [] Rule[ 16]."  United States v. Campbell, No. 1:04-CV-0424-RWS, 2006 WL 346446, at *1 (N.D. Ga. Feb. 13, 2006) (citations omitted); see also id. (citing United States v. Conroy, 424 F.3d 833, 838 (8th Cir. 2005)) ("summary of forensic expert's expected testimony that consisted of single sentence satisfied requirements of Rule 16").  Accordingly, the expert summary provided by the government in this

5

case satisfies the standards of Rule 16 of the Federal Rules of Criminal Procedure, and Warnock's objection to the contrary is without merit.

## B.     **Admissibility under *Daubert***

Warnock next argues that Sebestyen's expert testimony, as well as the DNA evidence in this case, should be excluded under *Daubert* because reliable "collection methods" were not employed in collecting the mask from the crime scene. [Doc. 81 at 4–6]. Alternatively, Warnock requests a *Daubert* hearing "to determine the admissibility of the government's proffered evidence." [Id. at 6–7]. The government counters that the DNA evidence satisfies *Daubert's* reliability standard, and that no *Daubert* hearing is necessary because the reliability of the scientific procedures used by Sebestyen to reach his opinion are not in question. [Doc. 82 at 4–6].

The admissibility of expert testimony is governed by Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under Daubert, 509 U.S. at 589, the trial court is required "to act as a gatekeeper to insure that speculative and unreliable opinions do not reach the

jury." Principi v. Survivair, Inc., 231 F.R.D. 685, 690 (M.D. Fla. 2005) (citing Daubert, 509 U.S. at 589 n.7). Hence, "[i]n determining the admissibility of expert testimony under Rule 702, district courts must consider whether the expert can testify competently on the areas he intends to discuss, whether the expert's methodology is sufficiently reliable, and whether the expert's testimony, through the application of his scientific, technical, or specialized expertise, will assist the trier of fact to understand the evidence." United States v. Jayyousi, 657 F.3d 1085, 1106 (11th Cir. 2011) (citing City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998)).

The Supreme Court has also articulated several non-exhaustive factors which may be relevant in determining the admissibility of expert testimony under Rule 702: (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review and publications; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; (5) and whether the technique or theory is generally accepted in the scientific community. See Daubert, 509 U.S. at 593–94. At bottom, "[t]he *Daubert* inquiry is a flexible one, giving district courts great latitude in determining which of the *Daubert* factors, if any, are appropriate in assessing the admissibility of expert testimony in a particular case."

United States v. Diaz, No. 07-20398-CR, 2008 WL 906725, at *2 (S.D. Fla. Mar. 28, 2008) (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999)).  As a result, "[t]rial courts have 'considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'" Wiand v. Wells Fargo Bank, N.A., No. 8:12-cv-00557-T-27EAJ, 2014 WL 1819616, at *2 (M.D. Fla. May 7, 2014) (quoting Kumho Tire, 526 U.S. at 152).

Additionally, "'*Daubert* hearings are not required.'" United States v. Campbell, Criminal Case No. 1:11–cr–00460–AT–RGV, 2012 WL 2374528, at *5 (N.D. Ga. Apr. 19, 2012), adopted by 2012 WL 2373037 (N.D. Ga. June 22, 2012) (citation omitted) (quoting Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla., 402 F.3d 1092, 1113 (11th Cir. 2005)); see also United States v. Kyler, 429 F. App'x 828, 830 (11th Cir. 2011) (per curiam) (unpublished) (citing United States v. Hansen, 262 F.3d 1217, 1234 (11th Cir. 2001) (per curiam)) ("[A] formal *Daubert* hearing is not required in every case[.]").  Thus, "'[a]lthough the Court must ensure that expert testimony is reliable and admissible, there is nothing in *Kuhmo Tire* or *Daubert* that requires the Court to conduct a pre-trial evidentiary hearing if the expert testimony is based on well-established principles.'" Campbell, 2012 WL 2374528, at *5 (citation omitted) (quoting United States v. Cooper, 91 F. Supp. 2d 79, 82 (D.D.C. 2000)). "Accordingly, where expert testimony is based on well-established science, the

8

courts generally have concluded that reliability problems go to weight, not admissibility." Id. (citations and internal marks omitted).

In this case, Warnock has failed to offer a viable basis for excluding Sebestyen's testimony or any related DNA evidence under *Daubert's* reliability standard. Indeed, Warnock does not challenge the validity of the scientific methodology of the DNA testing forming the basis of Sebestyen's opinion, see generally [Docs. 60 & 81], and federal courts around the country have repeatedly recognized the reliability of DNA profiling procedures such as those used here, see United States v. Morgan, No. 12-CR-223 VM, 2014 WL 5317508, at *2 (S.D.N.Y. Oct. 3, 2014) (footnote omitted) (noting that traditional methods of DNA testing . . . have been nearly universally accepted by courts as reliable"); Kaemmerling v. Lappin, 553 F.3d 669, 684 (D.C. Cir. 2008) (citation omitted) ("DNA profiling is currently 'the most reliable forensic technique for identifying criminals when biological material is left at a crime scene.'"); United States v. Gaines, 979 F. Supp. 1429, 1438 (S.D. Fla. 1997); see also Kyler, 429 F. App'x at 830–31 (citation omitted) (affirming district court's decision to admit expert testimony where defendant "point[ed] to no case of [the Eleventh Circuit] or the Supreme Court rejecting [the expert's scientific methodology] as not sufficiently reliable under *Daubert*). Instead, the sole argument offered by Warnock in support of his *Daubert* motions is his bare assertion that the mask from which the DNA was taken was initially obtained through improper

"collection methods" prior to its submission to the laboratory for testing. See [Doc. 81 at 4–6; Doc. 85 at 2]. In fact, Warnock specifically states in his reply that his request for a *Daubert* hearing "was based on the collection methods and whether the procedures utilized by the various law enforcement agencies involved in this case were based on scientific principles such that the DNA evidence the government seeks to introduce at trial against [him] is reliable." [Doc. 85 at 2].

Warnock appears to speculate that the supposed improprieties in the collection process may have exposed the mask to possible contamination. See [Doc. 81 at 4 (alleging that the mask was initially "collected and stored with other pieces of evidence" and was "only subsequently repackaged the next day . . . because the paper bags in which the evidence was previously stored had become wet"), 5 (second and third alterations in original) (citations and internal marks omitted) (arguing that the collection "methods employed were in derogation of forensic manuals" which "exhort[ crime scene investigators] to [w]rap and seal each item of evidence separately to avoid contamination," and [p]lace the evidence in clean, dry containe[rs] . . . with tamper-evident or filament tape"); Doc. 85 at 2 (emphasis added) (speculating about how the reliability of the DNA evidence would be affected "[i]f the evidence was contaminated or the sample tested was degraded as a result of the collection methods used")]. But Warnock presents nothing to support his contention that any contamination in fact occurred, or that the source of the

10

evidence from which the DNA was obtained was otherwise rendered unreliable by the way in which the mask was collected and stored prior to testing. See United States v. Perocier, 269 F.R.D. 103, 113 (D.P.R. 2009) (admitting expert testimony over defendants' objection where "defendants speculate[d] that the underlying data [might] be untrustworthy based on such issues as . . . reliability of the collection process," but failed to "make any showing that the data [was] actually inaccurate or [did] not support [the expert witness's] conclusions").

Moreover, "[t]he contamination of [] DNA evidence in the collection process and the weight to give it are questions for the jury to decide," United States v. Goodrich, 739 F.3d 1091, 1098 (8th Cir. 2014) (per curiam) (citations omitted), and thus "the great weight of legal precedent indicates that possible contamination issues go towards the weight—rather than the admissibility—of DNA evidence and should be brought out during cross-examination" before the jury, see United States v. Morrow, 374 F. Supp. 2d 42, 46 (D.D.C. 2005) (citations omitted). See also Redden v. Calbone, 223 F. App'x 825, 830 (10th Cir. 2007) (unpublished) (citation omitted) (noting that "flaws in the chain of custody that might have resulted from the police's handling of the evidence, such as contamination, 'go to the weight of the evidence, but will not preclude admissibility' if the government lays a proper foundation for the evidence at trial"); United States v. McCluskey, 954 F. Supp. 2d 1224, 1263 (D.N.M. 2013) (citation omitted) (noting that "challenges based on the possibility of

11

contamination [go] to the weight of the DNA evidence, not its admissibility"); Khadera v. ABM Indus. Inc., No. C08-0417RSM, 2011 WL 6813454, at *4 (W.D. Wash. Dec. 28, 2011) (citation omitted) ("[A]n objection regarding the manner in which data was collected goes to the weight, and not the admissibility, of [expert] testimony."). Accordingly, "[t]he Court concludes that [Warnock's] vague, speculative suggestions that there may have been contamination . . . are matters going to the weight of the DNA evidence, not its admissibility," McCluskey, 954 F. Supp. 2d at 1263–64, and the DNA evidence is not subject to exclusion under *Daubert*.

Without citing to any factual or legal support, Warnock also appears to argue that the purported deficiencies in the collection process should be imputed to Sebestyen's expert testimony relating to the subsequent DNA testing of the evidence collected. See [Doc. 81 at 5 ("There is no indication [] that the collection methods employed were reasonably based on scientific principles, and any testimony discussing evidence therefrom derived falls victim to the same deficiencies.")]. Yet Warnock has offered no explanation as to how the manner in which the evidence was collected in this case has any bearing on the validity of the scientific methodology employed upon the subsequent DNA testing of that evidence under laboratory conditions. Stated differently, Warnock's criticism of the collection process does not impugn the reliability of the well-established scientific procedures,

including DNA amplification and electrophoretic separation, relied upon by Sebestyen in reaching his opinion, and Warnock's criticism is therefore "more properly offered to the jury . . ., for [it] relates to the credibility of [Sebestyen's] opinions, nor their admissibility." See Hernandez v. Crown Equip. Corp., Civil Action No. 7:13–CV–91 (HL), 2015 WL 1064557, at *3 (M.D. Ga. Mar. 11, 2015) (citations omitted); see also Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1345 (11th Cir. 2003); Campbell, 2012 WL 2374528, at *5 (citation omitted) ("[W]hen expert testimony is based upon such well-established principles, a defendant must do more than file a generic motion to merit an evidentiary hearing.").

In sum, "[a]s the Eleventh Circuit has cautioned, '[t]he purpose of *Daubert* is to determine whether a methodology is sufficiently reliable to be presented to a jury,'" United States v. Davis, No. 11-60285-CR, 2013 WL 2156659, at *7 (S.D. Fla. May 17, 2013) (second alteration in original) (citation and internal marks omitted) (citing Hudgens v. Bell Helicopters/Textron, 328 F.3d 1329, 1338 (11th Cir. 2003)), but Warnock's sole objection to Sebestyen's opinion relates exclusively "to the accuracy of the information [Sebestyen] used in his methodology, not whether the methodology itself was reliable," Hernandez, 2015 WL 1064557, at *7. Because there is no dispute that the well-established methods of DNA testing forming the basis of

Sebestyen's opinion satisfy the reliability standards of *Daubert*, Warnock's motion to exclude evidence under *Daubert* is due to be denied, nor is a *Daubert* hearing warranted on the facts of this case. See Campbell, 2012 WL 2374528, at *5 (citations omitted).

C.   **Additional Requests Made in Warnock's Reply Brief, [Doc. 85]**

In his reply brief, Warnock also seeks an extension of time in which to have an expert review the documents submitted by the government with its pretrial disclosure. [Doc. 85]. In particular, Warnock asserts that much of the government's "DNA production appears to be raw data related to the testing of the DNA in this case and will require review by a defense expert familiar with the testing of DNA," but that "[d]ue to [the] defense expert's other professional commitments, it is anticipated that an additional 4–6 weeks is needed to review the DNA production and any additional documents that have not yet been produced." [Id. at 1–2].

As previously noted, the government produced its pretrial disclosure on January 23, 2015, after which Warnock was granted an extension until March 27, 2015, to file a perfected *Daubert* motion. Although Warnock had more than two months to review the government's production by the time he filed his perfected *Daubert* motion on March 27, 2015, his perfected motion makes no request for additional discovery related to the government's already extensive production, nor

14

did he indicate that he required expert review of any of the materials which the government submitted, or request an additional extension of time for any reason. See [Doc. 81]. Instead, Warnock did not formally submit these requests until he filed his reply brief on April 27, 2015, [Doc. 85]—a month after he filed his perfected *Daubert* motion, and more than three months after the government made its pretrial disclosure. Accordingly, Warnock has already had ample time in which to obtain expert review of the DNA data produced by the government, or at least to request a reasonable extension in which to secure such review, and he has offered no explanation warranting an additional extension of time in this regard.

Moreover, while Warnock contends that he now requires expert review of "any additional documents that have not yet been produced," [Doc. 85 at 2], additional discovery from the government is not necessary for the resolution of the pending *Daubert* motions, since, for the reasons already discussed, it is clear that the government's pretrial disclosure already satisfies the requirements of Rule 16, and Warnock has failed to present any evidence that further pretrial consideration of the admissibility of the DNA evidence in this case is warranted.[4] Nor has Warnock

---

[4] Since he is challenging the "collection methods" and not the validity of the scientific methodology of the DNA testing, Warnock has not explained why he requires the extensive list of items he has requested in Exhibt A to his reply brief, nor has he cited any authority to support his request to compel the government to produce the requested items.

shown good cause to support his request to defer his *Daubert* motions to the District Judge, [Doc. 85 at 3], which would only further needlessly postpone the resolution of matters now ripe for review. Therefore, the new requests made by Warnock in his reply brief—for an additional six weeks to allow a defense expert to review the government's pretrial disclosure; for an Order directing the government to produce additional discovery related to the DNA evidence; and for the *Daubert* motions to be deferred to the District Judge—are without merit and are due to be denied.

### III.  CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Warnock's motions to exclude DNA evidence and request for a *Daubert* hearing, [Docs. 60 & 81], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED AND RECOMMENDED**, this 7th day of May, 2015.

*Russell G. Vineyard*
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE