# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

COLEMAN WARNOCK

CRIMINAL CASE NO.

1:14-cr-00015-AT-RGV

## ORDER FOR SERVICE OF MAGISTRATE JUDGE'S
## REPORT, RECOMMENDATION, AND ORDER

Attached is the Report, Recommendation, and Order of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and Local Criminal Rule 59(2)(a)-(b). Let the same be filed and a copy, with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within fourteen (14) days of receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error(s) made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court. Failure to object to this Report and Recommendation waives a party's right to review. Fed. R. Crim. P. 59(b)(2).

Pursuant to Title 18, U.S.C. § 3161(h)(1)(D) and (H), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.** The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED** and **DIRECTED**, this 12th day of October, 2016.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL CASE NO. |
| | 1:14-cr-00015-AT-RGV |
| COLEMAN WARNOCK | |

## MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER

Defendant Coleman Warnock ("Warnock") is charged in a six-count superseding indictment with, among other offenses, conspiring to manufacture and possess with intent to distribute phencyclidine ("PCP"), in violation of 21 U.S.C. §§ 841 and 846. [Doc. 109].[1] Warnock has moved to suppress evidence and statements obtained following a traffic stop that occurred on September 25, 2003. [Doc. 127]. After an evidentiary hearing held on June 7, 2016,[2] the parties filed post-hearing

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] See [Doc. 161] for the transcript of the evidentiary hearing. Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)." In addition, the government submitted an exhibit during the hearing, which will be referred to as "(Gov. Ex. G-A)."

briefs on the motion.  <u>See</u> [Docs. 165, 180, 183, & 184].[3]  For the reasons that follow, it is **RECOMMENDED** that Warnock's motion to suppress, [Doc. 127], be **DENIED**.

## I.  STATEMENT OF FACTS

On September 25, 2003, uniformed Louisiana State Patrol Trooper Chad Gremillion ("Trooper Gremillion"),[4] was traveling in his patrol vehicle eastbound along Interstate 20 in Shreveport, Louisiana, accompanied by Texas Department of Public Safety Trooper Barry Washington ("Trooper Washington"),[5] when Trooper

---

[3] Warnock was granted an extension of time until August 26, 2016, to file his post-hearing brief, <u>see</u> [Doc. 178], which he entitled a reply brief, <u>see</u> [Doc. 180].  On September 8, 2016, almost two weeks after filing his post-hearing brief, Warnock filed a "Corrected Reply Brief In Support of Motion to Suppress Evidence." <u>See</u> [Doc. 183 (all caps omitted)].  However, Warnock did not obtain leave to file the corrected brief out of time.  Thus, the Court will not consider the corrected brief.  <u>See</u> <u>United States v. Kearse</u>, No. 2:14-cr-125-FtM-38CM, 2015 WL 2199341, at *1 n.2 (M.D. Fla. May 10, 2015) ("Since the Government's response was untimely and it failed to request leave to file the response out of time, the Court will not consider the filing.").  Even if the Court were to consider Warnock's corrected brief, it would not change the analysis of the issues presented because the corrected brief is substantially the same as Warnock's timely filed post-hearing brief, except for the inclusion of a time line of events, <u>compare</u> [Doc. 180 at 15], <u>with</u> [Doc. 183 at 13-14], and the Court has used the time line in the video recording of the traffic stop in considering Warnock's arguments, [Gov. Ex. G-A].

[4] Trooper Gremillion has been employed with the Louisiana State Police since 1999, and he was assigned to the criminal patrols unit as a uniform patrol trooper at the time of the traffic stop at issue.  (Tr. at 4-5).

[5] Trooper Gremillion testified that "Trooper Washington and some of his colleagues came to Louisiana to do a ride-along as part of a criminal patrol exchange that [the Louisiana State Police] had with the Texas Department of Public Safety" and that "Trooper Washington was paired with [him] to ride along [on September

Gremillion observed a U-Haul that they were behind "cross[] the fog line, a solid fog line, twice" in violation of La. Stat. Ann. § 32:79.[6]  (Tr. at 8, 11, 25, 37, 45).  Trooper Gremillion activated the blue lights on his patrol vehicle to initiate a traffic stop of the U-Haul,[7]  (Tr. at 9), and Trooper Washington asked, "What's the – what

25, 2003]."  (Tr. at 8).  Trooper Gremillion believed that September 25, 2003, was the first day that Trooper Washington rode with him, and he did not know how long Trooper Washington had been a police officer.  (Tr. at 38).

[6] La. Stat. Ann. § 32:79 provides in relevant part that "[w]henever any roadway has been divided into two or more clearly marked lanes for traffic . . . . [a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."  La. Stat. Ann. § 32:79(1).  Trooper Gremillion testified that Interstate 20 "was known at the time to be an interstate that was consistent with the transportation of large quantities of narcotics from West to East, to the East Coast, specifically because of the connection to the southern border of Texas and Mexico."  (Tr. at 25).  He further testified that "intelligence [] was disseminated to patrol officers that U-Hauls were in fact used in the transportation of large quantities of illegal narcotics across the United States on the highway system."  (Id.).

[7] Trooper Gremillion testified that, at the time of the traffic stop, "the dash camera [on his patrol vehicle] was wired into the lights, so when[] [he] flipped the toggle switch to activate [his] blue emergency lights, the video portion of the camera would begin recording," but that he would have to "manually turn on the audio portion" by pushing a switch on a box located on his belt.  (Tr. at 7, 42-43).  Thus, he testified that his dash camera did not capture Warnock's traffic violation, but that it did capture everything "[f]rom the moment that [he] activated [his] blue lights."  (Tr. at 9).  The evidence at the hearing included a video recording depicting the traffic stop in question.  See (Tr. at 9; Gov. Ex. G-A).  Trooper Gremillion testified that the beginning of the video was the conclusion of a prior traffic stop, having nothing to do with the traffic stop at issue in this case.  (Tr. at 10, 43-44); see also (Gov. Ex. G-A at 13:56-14:02).

3

violation?" (Tr. at 45-46; Gov. Ex. G-A at 14:02). Trooper Gremillion responded that the U-Haul had "hit the line." (Tr. at 45-46; Gov. Ex. G-A at 14:02).

After the U-Haul pulled over to the side of the road, Troopers Gremillion and Washington exited their patrol vehicle, and Trooper Gremillion asked the driver of the U-Haul, later identified as Warnock, to step to the rear of the vehicle,[8] and he asked him for his driver's license. (Tr. at 10, 12, 27-28; Gov. Ex. G-A at 14:03). Warnock volunteered that he had been pulled over not too long ago because he was "going kind of fast," but Trooper Gremillion testified that he had not noticed that particular infraction. (Tr. at 12; Gov. Ex. G-A at 14:03). Trooper Gremillion explained to Warnock that he stopped him because he hit the fog line. (Tr. at 11; Gov. Ex. G-A at 14:03). After Warnock looked for his license in his pockets and in a fanny pack he was wearing around his waist, he told the Troopers that he left his license in the cab, so he walked back to the cab of the U-Haul, accompanied by both Troopers, to retrieve his driver's license. (Tr. at 13, 55; Gov. Ex. G-A at 14:03-14:04). When they returned to the rear of the vehicle, Trooper Gremillion asked him where he was traveling, and Warnock stated that he was going to Augusta. (Tr. at 15; Gov. Ex. G-A at 14:04). Trooper Gremillion then asked Warnock for his rental papers for

---

[8] Trooper Gremillion explained at the evidentiary hearing that it was "procedure in Louisiana . . . [to] compel the driver out of the vehicle" and to stand between the patrol vehicle and the violator's vehicle. (Tr. at 6).

the U-Haul vehicle, which were likewise located in the cab of the vehicle, so Warnock returned to the cab to retrieve the rental papers.  (Tr. at 13-14, 55; Gov. Ex. G-A at 14:04-14:05).  While Warnock was retrieving the rental papers, Trooper Gremillion was "able to get a look inside the cab of the U-Haul," and he observed a dog and a CB radio.[9]  (Tr. at 15, 51-52).

When they returned to the rear of the U-Haul, Trooper Gremillion proceeded to ask Warnock several questions, including where he lived, where he rented the U-Haul, and whether he was following anyone or being followed by anyone.  (Tr. at 14; Gov. Ex. G-A at 14:05-14:06).  Warnock responded that he had rented the U-Haul in California and that he was not being followed or following anyone.  (Gov. Ex. G-A at 14:05-14:06).  Trooper Gremillion also asked Warnock if he had ever had any moving violations or been arrested, and he initially responded that he had not, (Tr. at 17, 56, 72; Gov. Ex. G-A at 14:07), but when Trooper Gremillion asked again whether he had been arrested previously, Warnock responded that he had, but only when he was a kid, (Tr. at 17, 56-57, 73-74; Gov. Ex. G-A at 14:07).  Trooper Washington then interrupted Warnock and asked him what was in the fanny pack

---

[9] Trooper Gremillion testified that based on his training and experience, "people that had CB radios [in 2003] or little two-way walkie-talkies could in fact be talking to someone who they [were] following or that [was] following them," which "could be an indicator of criminal activity."  (Tr. at 16).  He further testified that the CB radio "certainly raised [his] level of awareness."  (Tr. at 16, 70).

he was wearing around his waist.  (Tr. at 17, 57, 74; Gov. Ex. G-A at 14:07).  Warnock opened his fanny pack and pulled out various items, stating that he had his identification, phone bills, dental floss, and a phone book, but that he did not have any weapons.  (Gov. Ex. G-A at 14:07).  Both Troopers then examined the fanny pack.[10]  (Gov. Ex. G-A at 14:07-14:08).

After asking Warnock these questions and reviewing the rental papers, Trooper Gremillion contacted the Shreveport Troop Office and asked the dispatcher to conduct a driver's license and criminal history check on Warnock through the National Crime Information Center ("NCIC"), which was approximately five minutes after the U-Haul was stopped.  (Tr. at 18, 55; Gov. Ex. G-A at 14:08-14:09).  Troopers Gremillion and Washington continued to question Warnock about his destination.  (Tr. at 19-20; Gov. Ex. G-A at 14:09-14:10).  Trooper Gremillion then asked Warnock what he had in the back of the U-Haul, and Warnock responded that he had some furniture.  (Tr. at 20; Gov. Ex. G-A at 14:10).  Trooper Gremillion asked

---

[10] It is unclear from the video recording of the traffic stop whether the Troopers merely looked in the open fanny pack or actually reached inside of it to examine the contents because the fanny pack is blocked from view by Trooper Gremillion during this portion of the video recording.  See (Gov. Ex. G-A. at 14:07-14:08).  Although the Troopers asked about and appear to handle some items from the fanny pack, (id.), Warnock has not identified any items that were seized from the fanny pack that are the subject of his suppression motion, and since the parties have not discussed any issues regarding the seizure of items from the fanny pack in their post-hearing briefs, see [Docs. 165, 180, & 184], the Court does not address it any further.

him if he had the key to it and if he would mind opening it up, and Warnock responded that he did not mind, and he proceeded to locate the key and open the back of the U-Haul.  (Gov. Ex. G-A at 14:10); see also (Tr. at 20, 61).  Trooper Washington asked if he could step up and look inside, and Warnock said that he could.  (Gov. Ex. G-A at 14:10).  Trooper Gremillion also asked if Warnock would mind if they looked in the back of the U-Haul, and he responded, "No, sir," (id.); see also (Tr. at 20), and Trooper Gremillion then asked if there was anything illegal in there, and Warnock responded that there was not, (Gov. Ex. G-A at 14:10).  Trooper Washington entered the back of the U-Haul as Trooper Gremillion stood with Warnock at the rear of the vehicle.  (Tr. at 20-21, 57-58, 61-62; Gov. Ex. G-A at 14:10-14:11).  Trooper Gremillion asked Warnock if he had any weapons on him and patted him down, and Warnock responded that he did not have any weapons. (Gov. Ex. G-A at 14:11).  As Trooper Washington was searching inside the U-Haul, he told Trooper Gremillion to go ahead and place Warnock in handcuffs, and Trooper Gremillion handcuffed Warnock, but informed him that he was not under arrest.  (Id.).

While Trooper Washington continued his search of the U-Haul, Trooper Gremillion again inquired whether there was anything illegal in the vehicle, and

Warnock stated that there was not.  (Gov. Ex. G-A at 14:12).[11]  Trooper Washington

announced that he found bowls and a barrel of unknown chemicals in the U-Haul,

and Warnock explained that the items Trooper Washington found were detergents

used "[t]o make some soap."  (Tr. at 22); see also (Gov. Ex. G-A at 14:12-14:15, 14:19,

14:22).  Trooper Gremillion testified that Warnock was acting "very nervous," as he

could see "his carotid artery in the side of his neck beating very fast[,] [h]is story

[was] inconsistent, and his hands were shaking."  (Tr. at 23).  After Trooper

Washington exited the U-Haul, Trooper Gremillion learned from dispatch that

Warnock had "numerous violent felony offenses[,] including murder, robbery,

inflicting bodily harm, [and] grand theft."  (Tr. at 24; Gov. Ex. G-A at 14:19-14:20).

Trooper Gremillion asked Warnock if he was affiliated with any religious groups,

and Warnock responded that he was a Christian.[12]  (Tr. at 26-27; Gov. Ex. G-A at

---

[11] Trooper Gremillion specifically questioned Warnock about whether there were any illegal drugs in the U-Haul and asked for his cooperation, but Warnock denied that there were any drugs and said that he just wanted to be on his way. (Gov. Ex. G-A at 14:12).  The government has indicated that it does not intend to offer any statements Warnock made after he was handcuffed during its case-in-chief at trial.  [Doc. 165 at 8 n.5 (citations omitted)].  However, the statements are included here to provide a more complete account of the facts surrounding the stop and search of the U-Haul.

[12] Trooper Gremillion testified that he asked Warnock about his religious affiliation because in the past "there was a federal building in Oklahoma City that a U-Haul-type vehicle was parked in front of [that] blew up" and that "[t]wo years prior to this, New York City . . . was struck as an act of terrorism."  (Tr. at 26-27).  He further testified that he was uncertain what was in the U-Haul, but he "knew it was

14:20).  Trooper Gremillion requested additional officers at the scene "to inspect the items that were inside [of the U-Haul]."  (Tr. at 26; Gov. Ex. G-A at 14:21).  Both Troopers continued to search the U-Haul, and after the additional officers arrived and observed what was found during the search,[13] the U-Haul was transported to headquarters to meet the hazmat team.[14]  (Tr. at 47; Gov. Ex. G-A at 14:25, 14:47-14:48, 14:55).  It was later determined that sodium cyanide, which can be used to manufacture PCP, was among the items found in the U-Haul.  (Tr. at 27).

## II.  DISCUSSION

Warnock contends that the traffic stop on September 25, 2003, was not supported by probable cause, and therefore, all evidence and statements arising therefrom are due to be suppressed.  [Doc. 180 at 9-12].  Warnock also argues that even if the initial traffic stop was lawful, it was unnecessarily prolonged and

---

a chemical agent," and he "had no idea what the intent [was] of the driver or anyone affiliated with him[.]" (Tr. at 27).

[13] Approximately 35 minutes after Warnock was placed in handcuffs, Trooper Gremillion again informed Warnock that he was not under arrest, but he also advised him of his Miranda rights, and Warnock stated that he understood his rights.  (Gov. Ex. G-A at 14:47; see also (Tr. at 60-61); Miranda v. Arizona, 384 U.S. 436 (1966).

[14] Trooper Gremillion testified that he issued a citation for improper lane usage, as referenced in his police report, though he explained that he did not hand Warnock a physical ticket citation during the course of the traffic stop.  (Tr. at 26, 31-34, 71-73).

violated the Fourth Amendment both in its duration and scope.  [Id. at 12-18].

Finally, Warnock argues that his consent to search the vehicle was not valid because

it was the product of an illegal stop and not voluntary.  [Id. at 18-21].  The Court will

address each of these arguments.

A.   **Probable Cause to Initiate the Traffic Stop**

"The Fourth Amendment protects individuals from unreasonable search and

seizure."  United States v. Rowls, 402 F. App'x 467, 468 (11th Cir. 2010) (per curiam)

(unpublished) (citation and internal marks omitted).  The "[t]emporary detention of

individuals during the stop of an automobile by the police, even if only for a brief

period and for a limited purpose, constitutes a 'seizure' of 'persons' within the

meaning of [the Fourth Amendment]."  Whren v. United States, 517 U.S. 806, 809-10

(1996) (citations omitted); see also United States v. Purcell, 236 F.3d 1274, 1277 (11th

Cir. 2001);  United States v. Edenilson-Reyes, Criminal Action File No.

1:09–CR–00361–RWS–AJB, 2010 WL 5620439, at *9 (N.D. Ga. Oct. 26, 2010), adopted

by 2011 WL 195679, at *1 (N.D. Ga. Jan. 20, 2011).

A traffic stop is reasonable if the officer had probable cause to believe that a

traffic violation has occurred, or if the traffic stop is justified by reasonable suspicion

in compliance with Terry v. Ohio, 392 U.S. 1 (1968).  Edenilson-Reyes, 2010 WL

5620439, at *9 (citing United States v. Spoerke, 568 F.3d 1236, 1248 (11th Cir. 2009);

Purcell, 236 F.3d at 1277); see also United States v. Monzon-Gomez, 244 F. App'x 954, 959 (11th Cir. 2007) (per curiam) (unpublished); United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999); United States v. Sierra, Cr. No. 2:10cr183–MEF, 2011 WL 1675217, at *2 (M.D. Ala. Apr. 19, 2011), adopted by 2011 WL 1675180, at *1 (M.D. Ala. May 4, 2011), aff'd by 501 F. App'x 900 (11th Cir. 2012) (per curiam) (unpublished).  Thus, "[a] traffic stop . . . is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion. . . ."[15] Edenilson-Reyes, 2010 WL 5620439, at *9 (alterations in original) (citations and internal marks omitted); see also United States v. Boyd, 388 F. App'x 943, 947 (11th Cir. 2010) (per curiam) (unpublished); United States v. Woods, 385 F. App'x 914, 915 (11th Cir. 2010) (per curiam) (unpublished).  The government bears the burden of presenting facts to establish that the traffic stop is supported by reasonable suspicion or probable cause.  See Welsh v. Wisconsin, 466 U.S. 740, 749-50 (1984); see also United States v. Kelly, No. 1:13–cr–108–WSD–JSA, 2014 WL 1153375, at *8 (N.D. Ga. Mar. 21, 2014), adopted at *4 (citations omitted).

---

[15] Probable cause must be supported by more than a mere suspicion, but does not require the same "'standard of conclusiveness and probability as the facts necessary to support a conviction.'" United States v. Dunn, 345 F.3d 1285, 1290 (11th Cir. 2003) (quoting Wood v. Kesler, 323 F.3d 872, 878 (11th Cir. 2003)).  Reasonable suspicion is a less demanding standard than probable cause and requires only a fair probability that illegal activity has occurred.  United States v. Sokolow, 490 U.S. 1, 7 (1989).

An officer's subjective intentions and motives are irrelevant where the officer has probable cause for the stop.  See United States v. Mwangi, Criminal File No. 1:09-CR-107-TWT, 2010 WL 520793, at *3 n.9 (N.D. Ga. Feb. 5, 2010), adopted at *1 (citations omitted); see also United States v. Arango, 396 F. App'x 631, 632-33 (11th Cir. 2010) (per curiam) (unpublished) (citation and internal marks omitted) ("Where objectively reasonable conditions permit a stop, the officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment."); Miller v. Harget, 458 F.3d 1251, 1260 (11th Cir. 2006) (citations omitted) ("It is well-settled that an officer's subjective motivations do not affect whether probable cause existed"); United States v. Jimenez, No. 2:06-cr-74-FtM-29DNF, 2006 WL 2927477, at *2 (M.D. Fla. Oct. 11, 2006) (holding that "an officer's belief that he has probable cause or does not have probable cause is simply not a pertinent factor" in determining whether an arrest is lawful).  That is, "if the driver of a car has broken a traffic law, no matter how relatively minor, a motion to suppress evidence cannot be based on the argument that the stop was pretextual."  United States v. Wright, No. CR210-022, 2010 WL 4967468, at *1 (S.D. Ga. Nov. 5, 2010), adopted by 2010 WL 4967838, at *1 (S.D. Ga. Dec. 1, 2010) (citation omitted).

In addition, "[t]he propriety of the traffic stop [] does not depend on whether the defendant is actually guilty of committing a traffic offense." United States v. Sicairos-Sicairos, Criminal Action File No. 4:10–CR–054–HLM, 2011 WL 2710031, at *5 (N.D. Ga. July 11, 2011) (citation omitted). "Instead, the relevant question is whether it was reasonable for the officer to believe that a traffic offense had been committed." Id. (citation omitted).

Warnock argues that the traffic stop was not supported by probable cause because (1) although Trooper "Gremillion testified that he observed the truck cross the fog line twice, [] this alleged violation is missing from the video of the stop"; (2) Trooper "Gremillion's own partner–a trained police officer riding in the passenger seat–failed to notice anything wrong and is heard asking [Trooper] Gremillion 'what is the violation'"; and (3) Trooper "Gremillion's own conduct following the stop belies his claims" because "[n]ot once during the hour-long stop [did] he again mention the alleged traffic infraction for which he stopped Warnock" and "he never appear[ed] to make an effort to write Warnock a ticket and in fact, never [did]." [Doc. 180 at 9-11 (citations omitted)]. Warnock asserts that the alleged violation of crossing the fog line twice "never happened"[16] and that Trooper Gremillion's testimony to the contrary is unreliable. [Id. at 10-11].

---

[16] Warnock did not testify at the evidentiary hearing or offer any evidence to support this assertion.

Trooper Gremillion testified that "he observed [Warnock] drive outside of his lane of travel and cross over the fog line [twice]," in violation of La. Stat. Ann. § 32:79, United States v. Wilkerson, 405 F. App'x 893, 895 (5th Cir. 2010) (per curiam) (unpublished); see also (Tr. at 8, 11, 45), and based on this uncontradicted testimony, Trooper Gremillion "certainly had probable cause to stop [Warnock because] he observed [Warnock's U-Haul] cross over the [] fog line [two] times, which is a traffic violation," United States v. Sierra, 501 F. App'x 900, 903 (11th Cir. 2012) (per curiam) (unpublished) (citations omitted) (citing United States v. Harris, 928 F.2d 1113, 1116 (11th Cir. 1991)); see also United States v. Guevara-Miranda, Criminal No. 14-0164, 2015 WL 362325, at *6 (W.D. La. Jan. 20, 2015), aff'd, 640 F. App'x 319 (5th Cir. 2016) (per curiam) (unpublished) (citations omitted) (noting that the Louisiana Second Circuit Court of Appeal, the Louisiana Supreme Court, and the Fifth Circuit  have found that crossing the fog line in violation of La. Stat. Ann. § 32:79 is sufficient to provide a police officer with probable cause to initiate a traffic stop); United States v. Benitez, No. 2:12-cr-0028-KOB-JEO, 2012 WL 1642284, at *2 (N.D. Ala. Apr. 4, 2012), adopted by 2012 WL 1642170, at *1 (N.D. Ala. May 3, 2012) (finding officer had "probable cause to believe that the defendant violated the lane travel statute"

where "he observed the defendant's vehicle cross the fog line at least two or three times").[17]

Warnock challenges Trooper Gremillion's testimony based on the fact that the alleged traffic violation was not captured on the video recording of the traffic stop, [Doc. 180 at 9, 11]; however, the government responds that "in 2003, dash cam video technology was not as advanced as it is today" and that while "many dash cams [today] will rewind thirty seconds to a minute," [Doc. 184 at 1], Trooper Gremillion testified that at the time of the traffic stop at issue, the dash camera did not begin recording until he activated his blue lights, and thus, his dash camera did not record the alleged traffic violation because it occurred before he activated his blue lights, (Tr. at 7, 9). In fact, when cross-examined by Warnock's attorney as to why the dash camera did not capture the U-Haul crossing the fog line, Trooper Gremillion again explained that the dash camera was turned on when he "got ready to effect the traffic stop." (Tr. at 45). Warnock has not offered any evidence that contradicts Trooper Gremillion's testimony about the operation of the dash camera, and he has failed to show how the fact that the traffic violation was not recorded by the dash

---

[17] "Additionally, as noted by [Trooper Gremillion] . . ., [Warnock's] driving pattern indicated that he might be impaired, also warranting an investigatory stop." Benitez, 2012 WL 1642284, at *4 (footnote omitted); see also (Tr. at 15 (Trooper Gremillion's testimony that "driving while intoxicated" was one of his concerns because "people that do drive while intoxicated tend to drift over the fog line and travel on the shoulder")).

camera in any way undermines Trooper Gremillion's testimony that he observed the U-Haul cross the fog line twice on September 25, 2003.

Warnock also attempts to undermine Trooper Gremillion's testimony about observing a traffic violation by pointing out that, after Trooper Gremillion activated his blue lights, Trooper Washington asked, "What's the – what violation?" [Doc. 180 at 10]; (Tr. at 45-46; Gov. Ex. G-A at 14:02).  However, the mere fact that Trooper Washington asked this question does not call into doubt Trooper Gremillion's credible testimony that he observed the U-Haul cross the fog line.  As the government correctly contends, Warnock is asking "the Court to make several inferential leaps to reach a conclusion [based on one single question] that is unsupported by the facts." [Doc. 184 at 2].  There is nothing in the record to suggest that Trooper Washington disputed Trooper Gremillion's observation of the U-Haul crossing the fog line.  When Trooper Washington asked what was the violation, Trooper Gremillion responded that Warnock had "hit the line," and Trooper Washington accepted his answer without dispute.  (Tr. at 45-46; Gov. Ex. G-A at 14:02). Indeed, Trooper Gremillion's explanation for stopping Warnock when asked by Trooper Washington was the same reason he gave to Warnock when he explained why he had stopped him, and it is the same explanation he provided in his testimony at the evidentiary hearing.  (Tr. at 11; Gov. Ex. G-A at 14:03).  The

16

reason that Trooper Washington asked about the violation could be explained in many different ways,[18] and Warnock has not offered any evidence to support his contention that Trooper Washington asked that question because the violation did not, in fact, occur. Warnock's speculation about the reason Trooper Washington asked the question simply does not contradict Trooper Gremillion's consistent statements on the recording and his testimony at the evidentiary hearing that he observed the U-Haul cross the fog line in violation of Louisiana law.

Warnock also attacks Trooper Gremillion's credibility by contending that he did not mention the traffic violation during the entirety of the stop and did not issue Warnock a citation. [Doc. 180 at 11]. However, it is clear from the video that after Warnock said that he had recently been stopped for going kind of fast, Trooper Gremillion stated that he stopped him because he hit the fog line. (Gov. Ex. G-A at 14:03). And, Trooper Gremillion testified at the evidentiary hearing that he, in fact, wrote Warnock a citation for improper lane usage. (Tr. at 26). Although he initially could not remember whether he cited Warnock just in his report or actually issued him a physical citation, (Tr. at 31-34), he ultimately recalled that he had written a

---

[18] As the government points out, [Doc. 184 at 2], there is no proof about whether Trooper Washington was even watching the U-Haul at the time Trooper Gremillion observed it cross the fog line, and his question about the violation also could be interpreted as an inquiry about which provision of Louisiana state law had been violated, since Trooper Washington was from Texas and was riding along with Trooper Gremillion.

separate citation, which was supported by his police report that listed a specific citation number, (Tr. at 71-73). Thus, Warnock has not identified any valid basis to question Trooper Gremillion's testimony that he observed the U-Haul cross the fog line twice, and the Court finds Trooper Gremillion's testimony on this point credible.

In short, Trooper Gremillion's testimony established that he had probable cause to believe that Warnock had violated Louisiana law, which is "all that is necessary to conduct a traffic stop." United States v. Alvardo, No. 8:10-CR-348-T-30TGW, 2010 WL 5262736, at *5 (M.D. Fla. Nov. 17, 2010), adopted by 2010 WL 5262735, at *1 (M.D. Fla. Dec. 17, 2010) (citing Whren, 517 U.S. at 810). Having considered the evidence and testimony presented at the evidentiary hearing, the Court finds Trooper Gremillion provided credible testimony that he observed the U-Haul cross the fog line. See United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing that credibility determinations are "within the province of the factfinder"). Therefore, Trooper Gremillion had probable cause to stop Warnock for improper lane usage.

## B.    Scope and Duration of the Traffic Stop

Warnock next contends that Trooper Gremillion unreasonably extended the traffic stop. [Doc. 180 at 13-18]. Specifically, Warnock asserts that Trooper

"Gremillion [] exceeded the scope and duration of the traffic stop by detaining [him] based solely on premature suspicions and unparticularized hunches of drug activity" and that after he "provided his driver's license and rental agreement and [Trooper] Gremillion called it in, it became a fishing expedition." [Id. at 15]. In this respect, Warnock argues that "it is evident that [Trooper] Gremillion expanded the scope of the traffic stop far beyond the mere traffic ticket for pretextual reasons," and thus, "the government cannot meet its burden of proving there was a valid expansion of the traffic stop." [Id. at 17-18].

"[A]n officer's actions during a traffic stop must be reasonably related in scope to the circumstances which justified the interference in the first place, and the stop may not last any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity." United States v. Garcia, 284 F. App'x 791, 794 (11th Cir. 2008) (per curiam) (unpublished) (alteration in original) (citation and internal marks omitted). "[A]n officer may prolong the stop to investigate the driver's license and the vehicle registration and to perform a computer check." Edenilson-Reyes, 2010 WL 5620439, at *10 (citation omitted); see also United States v. Acosta, 807 F. Supp. 2d 1154, 1196-97 (N.D. Ga. 2011), adopted at 1169 (footnote and citations omitted) ("The duration of a traffic stop may be prolonged to investigate, by the use of computer checks, the driver's license and the

vehicle registration and, for officer's safety, the criminal history of the driver."). "The officer can lawfully ask questions, even questions not strictly related to the traffic stop, while waiting for a computer check of registration or examining a driver's license so long as it does not prolong beyond the time reasonably required to complete that mission." United States v. Cantu, 227 F. App'x 783, 785 (11th Cir. 2007) (per curiam) (unpublished) (alteration, citation, and internal marks omitted).[19] "When examining the reasonableness of a traffic stop, the length of time before consent is given to search is also relevant." Garcia, 284 F. App'x at 794 (citation omitted). "Ordinarily, when a citation or warning has been issued and all record checks have been completed and come back clean, the legitimate investigative purpose of the traffic stop is fulfilled." Edenilson-Reyes, 2010 WL 5620439, at *10 (citation and internal marks omitted).

"However, a traffic stop may last longer than the purpose of the stop would ordinarily permit if an officer, based on specific facts and rational inferences drawn from those facts in light of his training and experience, has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring." United States v. DeJesus, 435 F. App'x 895, 900 (11th Cir. 2011) (per curiam) (unpublished)

---

[19] That is, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Arizona v. Johnson, 555 U.S. 323, 333 (2009) (citation omitted).

(citations omitted).  That is, "[a]n investigative stop can grow out of a traffic stop so long as the officer has reasonable suspicion of criminal activity to expand his investigation, even if his suspicions were unrelated to the traffic offense that served as the basis of the stop."  United States v. Gomez Serena, 368 F.3d 1037, 1041 (8th Cir. 2004) (citation omitted).  As the Supreme Court recently held, "[a] seizure justified only by a police-observed traffic violation . . . become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation," absent either reasonable suspicion or consent.  Rodriguez v. United States, 135 S. Ct. 1609, 1612-13 (2015) (all but first alteration in original) (citation and internal marks omitted).

Trooper Gremillion testified that after he and Trooper Washington exited their patrol vehicle, he asked Warnock to exit his vehicle and to step to the rear of the vehicle as that was the procedure employed on traffic stops in Louisiana.[20]  (Tr. at 6, 10); see also (Gov. Ex. G-A at 14:03).  Trooper Gremillion asked Warnock for his driver's license and subsequently for his rental papers for the U-Haul.  (Tr. at 12-14;

---

[20] When officers are conducting a valid traffic stop, they may lawfully order the suspect to exit the vehicle.  Maryland v. Wilson, 519 U.S. 408, 414-15 (1997); Pennsylvania v. Mimms, 434 U.S. 106, 110-11 & n.6 (1977) (per curiam) (holding that concern for a police officer's safety outweighed the slight intrusion on a motorist's liberty when the police officer, who had no reason to believe the motorist was armed or dangerous, directed the motorist stopped for a minor traffic infraction to step out of his vehicle); see also United States v. Swann, No. 4:14-mj-0102-MSH, 2014 WL 6605610, at *3 (M.D. Ga. Nov. 20, 2014).

Gov. Ex. G-A at 14:03-14:04). Warnock searched his pockets and fanny pack for his driver's license before returning to the cab of the U-Haul to retrieve his license and again returned to the cab later to obtain the rental papers. (Gov. Ex. G-A at 14:03-14:05). After the Troopers asked several questions, including where he was traveling, where he lived, where he rented the U-Haul, whether he was being followed or following anyone, and whether he had been arrested, and examined Warnock's fanny pack, (Tr. at 14-15, 17, 56-57, 72-74; Gov. Ex. G-A at 14:05-14:08), Trooper Gremillion contacted a dispatcher at the Shreveport Troop Office and asked the dispatcher to conduct a driver's license and criminal history check through NCIC, (Tr. at 18, 55; Gov. Ex. G-A at 14:08-14:09). While waiting on the results, Troopers Gremillion and Washington asked Warnock what he had in the back of the U-Haul and if he would mind opening it for them, (Tr. at 20, 61; Gov. Ex. G-A at 14:10), and Warnock took the key out of his pocket and unlocked and opened the back of the U-Haul, (Tr. at 20, 61; Gov. Ex. G-A at 14:10), at which time, both Troopers asked if Warnock would mind if they looked in the back of the U-Haul, and he consented, (Gov. Ex. G-A at 14:10); see also (Tr. at 20). As Trooper Washington searched the U-Haul, he told Trooper Gremillion to handcuff Warnock, and Trooper Washington announced that he had found some unknown chemicals in bowls and a barrel. (Tr. at 20-21, 57-58, 61-62; Gov. Ex. G-A at 14:10-14:11).

Trooper Gremillion received the results of the driver's license and criminal history check after Trooper Washington had already located the suspicious items in the back of the U-Haul.  (Tr. at 24; Gov. Ex. G-A at 14:19-14:20).

In his brief in support of his motion to suppress, Warnock recognizes that police officers may prolong a traffic stop in order to check the driver's license or to wait for the results of a criminal history check that was part of the routine traffic investigation, if the officer has articulable suspicion of illegal activity, or with the individual's consent.  [Doc. 180 at 14 (citing United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003))].[21]  However, without further explanation, Warnock asserts that the government cannot justify extending the traffic stop in this case based on a computer check, criminal history check, or consent, and he therefore focuses entirely on Trooper Gremillion's lack of articulable suspicion.  [Id. at 14-18].  The

---

[21] Warnock argues that Boyce "should guide this Court's decision" because the "Eleventh Circuit addressed a traffic stop similar to the stop in the instant case." [Doc. 180 at 13].  In Boyce, the Eleventh Circuit found that the officer could not extend the traffic stop for a criminal history check that was not part of the routine computer check, as it was done after the license check was completed and the citation was issued, and that the officer should have let the defendant go unless he had articulable suspicion of other criminal activity, which the court found the officer did not have. 351 F.3d at 1107-10.  However, Trooper Gremillion asked for a driver's license and criminal history check at the same time as part of his traffic investigation, and Boyce explicitly stated that the Eleventh Circuit has "found that officers may permissibly prolong a detention while waiting for the results of a criminal history check that is part of the officer's routine traffic investigation."  Id. at 1106 (citation omitted).  Thus, Warnock's argument is unpersuasive.

government responds that it "did argue in its opening brief that [Trooper] Gremillion had asked for a check of [Warnock's] license and criminal history," and that while he was "waiting for a reply from dispatch regarding the records check, Warnock consented." [Doc. 184 at 3-4 (internal marks omitted) (citing [Doc. 165 at 4-5])]. The record supports the government's position.

Trooper Gremillion "was still waiting for the results of the computer check . . . when he asked for and received [Warnock's] consent to search the vehicle." Purcell, 236 F.3d at 1278. "The traffic stop, therefore, had not concluded prior to the consent to search, and the detention continued to be supported by the facts that justified its initiation." Id. (citing United States v. Zucco, 71 F.3d 188, 190 (5th Cir. 1995); United States v. Shabazz, 993 F.2d 431, 437 (5th Cir. 1993)); see also United States v. Whitlock, 493 F. App'x 27, 31-32 (11th Cir. 2012) (per curiam) (unpublished). And, while the Eleventh Circuit has recognized that "[u]nder some circumstances a criminal record request might lengthen a traffic stop beyond what is reasonable in a particular case," in this case, Warnock "consented to a search of his car approximately [eight] minutes into the traffic stop," and these "initial [eight] minutes . . . are the only ones relevant to [the] determination whether the duration of the traffic stop was reasonable." Purcell, 236 F.3d at 1279 (footnote omitted). "The period of [approximately] [eight] . . . minutes that elapsed between the initial

24

stop and his consent to the search was not unreasonable."   <u>United States v.</u>
<u>Gonzalez</u>, 275 F. App'x 930, 934 (11th Cir. 2008) (per curiam) (unpublished); <u>see also</u>
<u>Purcell</u>, 236 F.3d at 1279 (citations omitted) (finding fourteen minutes was not an
unreasonable duration for a traffic stop and noting that the Eleventh Circuit has
"approved traffic stops of much longer duration"); <u>Whitlock</u>, 493 F. App'x at 31
(seven minutes between initial stop and when drug dog alerted was "not an
unreasonable duration for a traffic stop").

During the approximately eight minutes between the initial stop and
Warnock's consent to search the vehicle, as the government points out, "Trooper
Gremillion focused on the reason for the stop and officer safety, both squarely
within the mission of the traffic stop."   [Doc. 165 at 4].   In particular, Trooper
Gremillion asked for Warnock's driver's license and rental papers and inquired
about where he was traveling and where he lived.   Trooper Gremillion also asked
Warnock whether he was following anyone or being followed and if he had ever
had a moving violation or been arrested, and inquired about the contents of the
fanny pack he was wearing, all of which fall within the proper scope of a traffic stop.
<u>See</u> <u>United States v. Santillian</u>, No. 13 Cr. 138(RWS), 2013 WL 4017167, at *7
(S.D.N.Y. Aug. 7, 2013) (citations omitted) (finding that it was not unconstitutional
for the officers "to ask about the occupants' comings and goings" during a traffic

stop).  Indeed, "[i]t is well established that an officer is free to ask traffic-related questions, and questions about a driver's identity, business and his travel plans during the course of a traffic stop." United States v. Ellis, 497 F.3d 606, 614 n.1 (6th Cir. 2007) (citation and internal marks omitted); see also United States v. Sanchez, 417 F.3d 971, 975 (8th Cir. 2005) (citations omitted) (noting that a reasonable traffic stop investigation includes checking the driver's license, the vehicle's registration, inquiring about the occupants' destination, route, and purpose, and verifying the driver's story with passengers); United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000) (citation and internal marks omitted) (finding "questions about travel plans are routine and may be asked as a matter of course without exceeding the proper scope of a traffic stop").

Even if some of the questions that Troopers Gremillion and Washington asked were found to be outside the scope of the traffic stop, given that only approximately eight minutes passed from the initial stop until Warnock consented to the search of the U-Haul, the Court finds that the asking of any unrelated questions "did not unreasonably prolong the traffic stop," United States v. Burrows, 564 F. App'x 486, 491 (11th Cir. 2014) (per curiam) (unpublished) (finding that questions unrelated to the traffic stop asked during the 12-minute duration before the dog alerted did not unreasonably prolong the stop); see also United States v. Barker, 644 F. App'x 1000,

1002 (11th Cir. 2016) (per curiam) (unpublished) (citations omitted); Johnson, 555 U.S. at 333 (citation omitted) ("An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquires do not measurably extend the duration of the stop."); United States v. Trevino, Criminal Case No. 1:13-CR-0324-01-SCJ, 2015 WL 859386, at *8 (N.D. Ga. Feb. 27, 2015), adopted at *1 (finding "questions posed to [d]efendant unrelated to the stop were not improper and did not prolong the stop"), particularly in light of the fact that the Troopers were still awaiting the results of the driver's license and criminal history check and had not yet completed the initial purpose of the stop.[22]

## C.   Consent to Search

Warnock asserts that he "did not voluntarily consent to the search of the truck" because he was "[p]ressured by a coercive environment and unaware of his right to refuse consent." [Doc. 180 at 18-19]. Warnock also argues that "[e]ven if the initial consent was lawful, the subsequent search and seizure of [his] private property was unconstitutional" because "the officer's search of the truck and the boxes exceeded the scope of the initial consent." [Id. at 19].

---

[22] Since the Court finds that the Troopers "did not impermissibly extend the duration of the traffic stop, [the Court] need not decide whether [Warnock's] actions gave rise to reasonable suspicion here." Burrows, 564 F. App'x at 491 n.7.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'"  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 454-455 (1971); Katz v. United States, 389 U.S. 347, 357 (1967)).  "One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent."  United States v. Garcia,  890 F.2d 355, 360 (11th Cir. 1989). "An officer conducting a routine traffic stop may request consent to search the vehicle."  United States v. Harris, 526 F.3d 1334, 1339 (11th Cir. 2008) (per curiam) (citation and internal marks omitted).

"In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice."  Garcia, 890 F.2d at 360. "[T]he principles for determining the voluntariness of consent for a search are the same as those for determining the voluntariness of a confession– i.e. whether consent is voluntary turns on questions of fact, determinable from the totality of the circumstances."  United States v. Boskic, Criminal No. 04-10298-DPW, 2006 WL

1540488, at *19 (D. Mass. June 2, 2006) (citation and internal marks omitted); see also

United States v. Tovar-Rico, 61 F.3d 1529, 1535 (11th Cir. 1995) (noting voluntariness

of consent is judged in light of the totality of the circumstances).  Relevant factors

include the presence of coercive police procedures, the extent of the person's

cooperation with the officer, the person's awareness of his right to refuse consent,

the person's education and intelligence, and the person's belief that no incriminating

evidence will be found.  Purcell, 236 F.3d at 1281; see also United States v. Chaidez-

Reyes, Criminal Action No. 1:13-CR-158-ODE-AJB, 2014 WL 547178, at *15 (N.D. Ga.

Feb. 10, 2014), adopted at *1.  Ultimately, the burden is on the government to prove

that the consent was given voluntarily.  United States v. Bentley, 151 F. App'x 824,

827 (11th Cir. 2005) (per curiam) (unpublished) (quoting United States v. Chemaly,

741 F.2d 1346, 1352 (11th Cir. 1984)); Tovar-Rico, 61 F.3d at 1536 (quoting Florida v.

Royer, 460 U.S. 491, 497 (1983)); United States v. Blake, 888 F.2d 795, 798 (11th Cir.

1989).

　　　　Trooper Gremillion testified on direct and cross-examination that Warnock

voluntarily consented to the search of the U-Haul. (Tr. at 20, 58).  Trooper

Gremillion's testimony was consistent with the video of the traffic stop, in which

both Troopers asked if Warnock would mind if they looked in the back of the U-

Haul, and he consented, without any hesitation, stating, "No, sir."  (Gov. Ex. G-A.

29

at 14:10). The video also shows that the Troopers used a casual, conversational tone, did not draw their weapons, did not use physical force or restrain Warnock, and had not threatened him in any way, but simply asked Warnock if they could search the U-Haul, and Warnock orally consented. See generally (Gov. Ex. G-A); see also United States v. Zapata, 180 F.3d 1237, 1242 (11th Cir. 1999) (alterations in original) (citation omitted) ("'[T]he absence of intimidation, threats, abuse (physical or psychological), or other coercion is a circumstance weighing in favor of upholding what appears to be a voluntary consent.'").

While Warnock argues that he was unaware of his right to refuse consent and that his consent was therefore involuntary, [Doc. 180 at 19], the fact that the officers did not inform Warnock of his right to refuse consent is not dispositive, see Zapata, 180 F.3d at 1242 (holding consent voluntary despite fact that officer failed to inform defendant of right to refuse consent); see also Bentley, 151 F. App'x at 828 (noting knowledge of right to refuse consent is only one factor to be taken into account, and the government "need not establish such knowledge as the *sine qua non* of an effective consent").[23] Warnock's assertion that the totality of the circumstances amounted to a coercive environment because he was nervous and was "persistently

---

[23] And, Trooper Gremillions's failure to have Warnock sign a consent form also does not render the search involuntary. See United States v. Smith, 199 F. App'x 759, 761, 763 (11th Cir. 2006) (per curiam) (unpublished) (finding oral consent voluntary where defendant did not sign consent to search form).

questioned" by two uniform officers on the side of a busy highway is likewise without merit. See Zapata, 180 F.3d at 1241 (citing Berkemer v. McCarty, 468 U.S. 420, 438-39 (1984)) (noting a "public highway is [a] setting generally less coercive than [a] police station"); United States v. Espinosa-Orlando, 704 F.2d 507, 513 (11th Cir. 1983) (holding consent voluntary despite the fact that the individual was arrested at gunpoint by four agents, forced to lay on the ground near the roadway, and provided consent while one officer had his weapon drawn).

"Considering the totality of these facts and circumstances, and comparing this encounter to more coercive circumstances that have nonetheless been found to be consensual, the Court finds that [Warnock] freely and voluntarily consented to a search of the [U-Haul]." United States v. Rodriguez-Alejandro, 664 F. Supp. 2d 1320, 1338 (N.D. Ga. 2009), adopted at 1326 (citations omitted); see also United States v. Brown, 223 F. App'x 875, 880 (11th Cir. 2007) (per curiam) (unpublished) (finding consent to search voluntary despite the fact that officer had drawn his weapon and placed defendant in handcuffs); United States v. Hidalgo, 7 F.3d 1566, 1567, 1571 (11th Cir. 1993) (finding consent voluntary where defendant was arrested by law enforcement who had broken into his home early in the morning, woke him up, and forced him to the ground at gun point); Garcia, 890 F.2d at 361 (holding consent voluntary where defendant was arrested by numerous officers, was patted down for

weapons, was handcuffed, and where the officers refused to accept defendant's conditional consent to search and threatened to obtain a search warrant if he did not consent to a full search).  Additionally, "once [Warnock] gave [the Troopers] consent to search his [U-Haul], he also provided consent to prolong the traffic stop." United States v. Lamela-Cardenas, Criminal Action No. 1:11-00122-KD-C,  2011 WL 3494562, at *7 (S.D. Ala. Aug. 10, 2011) (citation omitted).

Warnock contends that the scope of his initial consent was exceeded when the Troopers opened sealed boxes in the back of the U-Haul.  [Doc. 180 at 19].  "'A consensual search is manifestly reasonable so long as it remains within the scope of the consent,'" DeJesus, 435 F. App'x at 902 (quoting United States v. Martinez, 949 F.2d 1117, 1119 (11th Cir. 1992)), and where no limits are placed on the scope of the consent, a search is "'constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass,'" Martinez, 949 F.2d at 1119 (quoting Harris, 928 F.2d at 1117).

Warnock verbally consented to the search of his U-Haul.  (Tr. at 20; Gov. Ex. G-A at 14:10).  He "did not limit the scope of [his] consent, nor did [he] object when [Trooper Washington] searched [his] [boxes], indicate that []he had not given consent to search [his] [boxes], or indicate that the [Troopers] should not search [his] [boxes]."  United States v. Maloch, Criminal Action No. 2:14-CR-00014-RWS, 2015

32

WL 1888450, at *9 (N.D. Ga. Apr. 14, 2015), adopted at *1. In fact, from the moment Troopers Gremillion and Washington began interacting with Warnock, Warnock cooperated, and during the search, he did not voice any objections, nor did he rescind his consent in any way. <u>See generally</u> (Gov. Ex. G-A). "Under these circumstances, the [Court] finds that the [Troopers] reasonably interpreted the scope of [Warnock's] consent to include the [boxes] located in the [U-Haul]." <u>Maloch</u>, 2015 WL 1888450, at *9 (citations omitted); <u>see also</u> <u>United States v. Najera-Perez</u>, Civil Action No. 1:12-CR-232-2-CAP, 2014 WL 888651, at *25 (N.D. Ga. Mar. 6, 2014), adopted at *1 (citation omitted) (holding where defendant gave unrestricted consent to search vehicles, it was "reasonable for law enforcement officers to interpret [d]efendant's unlimited consent to encompass compartments within [d]efendant's vehicles"); <u>United States v. Edwards</u>, Criminal Action File No. 1:10-CR-132-RWS/AJB, 2010 WL 5184784, at *7 (N.D. Ga. Oct. 13, 2010), adopted by 2010 WL 5276983, at *1 (N.D. Ga. Dec. 15, 2010) (finding that where the defendant's consent was "not limited in anyway" the general consent to search extended to papers found in the vehicle).[24]  Accordingly, Warnock voluntarily consented to the extension of

---

[24] To the extent Warnock argues that he withdrew his consent to search when he said that he just wanted to be on his way after he was handcuffed, <u>see</u> [Doc. 180 at 21], this statement did not unequivocally revoke the consent to search that he had previously provided, <u>see e.g.</u>, <u>United States v. Ross</u>, 263 F.3d 844, 846 (8th Cir. 2001) (citations and internal marks omitted) (finding expressions of impatience did not amount to "unequivocal act or statement of withdrawal" indicating an intent to

the lawful traffic stop to allow Troopers Gremillion and Washington to search the U-Haul, and since the September 25, 2003, traffic stop and subsequent detention and search were lawful, it is **RECOMMENDED** that Warnock's motion to suppress evidence arising from the traffic stop, [Doc. 127], be **DENIED**.[25]

### III.   CONCLUSION

For the foregoing reasons and cited authority, it is hereby **RECOMMENDED** that Warnock's motion to suppress evidence and statements, [Doc. 127], be **DENIED**.

---

revoke consent to search); <u>United States v. Alfaro</u>, 935 F.2d 64, 67 (5th Cir. 1991) (citations omitted) ("[U]nequivocal act or statement of withdrawal" is required to show a person withdraws consent to search.).

[25] The government argues that "all of the statements made by Warnock before he was handcuffed are admissible" because "[a] person detained pursuant to a routine traffic stop is not in custody" and that it "does not intend to use any statements made by Warnock after he was handcuffed in its case in chief at trial," [Doc. 165 at 7-8 & n.5 (citations omitted)]; <u>see also</u> (Tr. at 2, 64-66 (Government's announcement that it will not introduce evidence in its case in chief at trial of any statement made by Warnock after he was handcuffed)).   Warnock has not specifically addressed the government's argument regarding statements he made before he was handcuffed, <u>see</u> [Doc. 180], and the Court agrees with the government that these statements are admissible.   During the traffic stop, Warnock was standing at the back of the U-Haul on a roadway open to public view and he was not yet physically restrained, and thus, he was not in custody for the purposes of <u>Miranda</u>, and since there is no evidence that his statements were coerced, the statements he made prior to being handcuffed are admissible at trial.   <u>See</u> <u>United States v. Crawford</u>, 294 F. App'x 466, 473-74 (11th Cir. 2008) (per curiam) (unpublished). Thus, it is **RECOMMENDED** that Warnock's motion to suppress statements prior to being handcuffed be **DENIED**, and his motion to suppress statements he made after being handcuffed be **DENIED AS MOOT**.

34

There are no other pending matters before the Magistrate Judge,[26] and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED,** this 12th day of October, 2016.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

---

[26] On December 16, 2014, Warnock also filed a motion to allow participation in voir dire, [Doc. 61], but that motion has been deferred to the District Judge, see [Doc. 63].

35