IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | CRIMINAL INDICTMENT |
| | : | NO. 1:14-CR-15-AT-1 |
| COLEMAN WARNOCK | : | |
| Defendant. | : | |
| | : | |
| | : | |

## **ORDER**

### **I. Introduction**

This case arises on Defendant Coleman Warnock's ("Mr. Warnock") Motion to Suppress [Doc. 127]. Mr. Warnock was initially indicted in January 2014 on six charges relating to the manufacture and possession of phencyclidine ("PCP") in violation of U.S.C. §§ 841 and 846. (Doc. 1.) In September 2014, Mr. Warnock was arrested in California and transferred to Atlanta where he has since been detained. In February 2016, the government filed a superseding indictment in this case. (Doc. 109.) Along with this superseding indictment, the government filed notice of its intention to introduce evidence relating to Mr. Warnock's 2003 Louisiana arrest and conviction for misdemeanor reckless handling of hazardous materials.[1] (Doc. 113.) Specifically, the government seeks to introduce evidence

---

[1] The government believes that this prior conviction is admissible as evidence of Defendant's guilt for crimes charged in the indictment in this case. However, "in the event that evidence of this arrest and conviction are not otherwise admissible," the government notified the Defendant that it would attempt to introduce this evidence under Rule 404(b). (Gov. Notice of Intent, Doc. 113.) Federal Rule of Evidence 404(b) allows a party to introduce evidence of crimes, wrongs, or

from a traffic stop on Interstate 20 where officers ultimately searched the back of Mr. Warnock's rented U-Haul and discovered hazardous chemicals, including sodium cyanide.[2] Defendant has moved to suppress all evidence and statements obtained in connection with the search of Mr. Warnock and his vehicle on September 25, 2003.[3] (Doc. 127.) Magistrate Judge Russell Vineyard's Report and Recommendation ("R&R") (Doc. 185) recommends the denial of Defendant's Motion to Suppress.

Mr. Warnock has filed objections to the R&R that challenge the Magistrate Judge's findings, and absence of findings, concerning: (1) whether the Troopers had probable cause to stop Mr. Warnock; (2) whether the stop was unlawfully extended through impermissible questioning and an illegal fanny pack search; and (3) whether Mr. Warnock voluntarily consented to the search of the U-Haul (Doc. 205).

A district judge has broad discretion to accept, reject, or modify a magistrate judge's proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 680 (1980). Pursuant to 28 U.S.C. § 636(b)(1), the Court reviews any portion of the R&R that is the subject of a proper objection on a de novo basis and any non-objected portion on a "clearly erroneous" standard. Accordingly, the Court has reviewed the Defendant's motions on a de novo basis

---

other acts for purposes of proving motive, opportunity, intent, preparation, plan knowledge, identity, or a similar purpose. In a criminal case, a prosecutor must provide reasonable notice of the general nature of the evidence, if requested by the defendant. Fed. R. Ev. 404(b).

[2] Sodium cyanide can be used to manufacture PCP.

[3] The government has represented that they do not intend to introduce any statements Mr. Warnock made after the time he was handcuffed at approximately 14:11:49. (Gov. Resp. to Mot. to Suppress, Doc. 165 at 8 & n.5.)

as Defendant's objections go to the essence of the Magistrate Judge's evidentiary and legal analysis. The Court's rulings are set forth below.

## II. Discussion of the R&R and Overall Findings

### A. Probable cause to stop

On September 25, 2003, Louisiana State Patrol Trooper Chad Gremillion ("Trooper Gremillion") was traveling eastbound on Interstate 20 accompanied by Trooper Barry Washington ("Trooper Washington") of the Texas Department of Public Safety.[4] Just after 2:00 p.m. in the afternoon, Troopers Gremillion and Washington pulled over a U-Haul truck for alleged traffic violations of crossing the fog-line twice, in violation of La. Stat. Ann. § 32:79.[5] Though this stop was recorded (Gov. Ex. A.), the initial alleged traffic violations — the fog-line crossings – were not captured on video. The video instead begins after the purported infractions, with Trooper Washington asking Trooper Gremillion "what violation" he observed as they pull the U-Haul over. (Gov. Ex. A at 14:02; Gov. Video Tr., Doc. 239-1 at 1.)

Mr. Warnock argues that Troopers Gremillion and Washington did not have reasonable suspicion or probable cause to stop him[6], rendering the entire

---

[4] Trooper Washington was paired with Trooper Gremillion for a ride-along pursuant to a criminal patrol exchange between the Louisiana State Police and the Texas Department of Safety. September 25, 2003, the day of the stop, was the first day Trooper Washington had been paired with Trooper Gremillion. (Ev. Hr'g Tr., Doc. 161 at 8, 11, 25, 37, 38, 45.)

[5] The statute provides that: "[w]henever any roadway has been divided into two or more clearly marked lanes for traffic. . . [a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." La. Stat. Ann. §32:79(1).

[6] "[A] traffic stop [] is constitutional if it is either based on probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with *Terry*." *United*

stop and all subsequent searches unlawful. (Def. Obj., Doc 205 at 2-3.) Essentially, Mr. Warnock argues that Trooper Gremillion did not actually observe a traffic violation and thus amassed no evidence that would amount to probable cause. (*Id.* at 3,5.) More specifically, Mr. Warnock contends that Trooper Gremillion was not credible in his testimony that he observed the fog-line crossings because (1) there is no recorded violation on the videotape of the stop supporting Trooper Gremillion's testimony and (2) Trooper Washington, who was sitting next to Trooper Gremillion, did not see a traffic violation. (Gov. Ex. A at 14:02; Video Tr., Doc. 239-1 at 1.) Rather than being stopped based on a true observation of a traffic infraction, Mr. Warnock argues that he was stopped based on Trooper Gremillion's assumptions that individuals driving U-Hauls on I-20 were often transporting large quantities of illegal narcotics.[7] (Def. Obj. at 8.) In support, Mr. Warnock suggests that the Troopers' actions of asking him to exit the vehicle, asking multiple intrusive questions, and delaying in calling in the license check demonstrate that the stop was a fishing expedition for drugs rather than the result of a minor traffic violation. (Def. Obj. at 7-8.)

The Magistrate Judge determined that the government had established the existence of probable cause through Trooper Gremillion's testimony that he observed the U-Haul cross the fog-line twice. (R&R at 17-18.) (Citing Ev. Hr'g

---

*States v. Harris*, 526 F.2d 1334, 1337 (11th Cir. 2008). The government does not argue that Trooper Gremillion had reasonable suspicion to stop under *Terry* but argues that he had probable cause to stop. The Court, therefore, conducts its analysis of the events at issue under the standard of probable cause.

[7] Trooper Gremillion testified that patrol officers received intelligence that U-Hauls were being used to transport large quantities of illegal narcotics across the United States on the highway system. (Ev. Hr'g. Tr., Doc. 161 at 25.)

4

Tr., Doc. 161 at 11, 26.) The Magistrate Judge notes that an officer's credible testimony supporting probable cause is "all that is necessary to conduct a traffic stop." (*Id*) (citing *United States v. Alvardo*, 2010 WL 5262736 at *5 (M.D. Fla. Nov. 17, 2010) (citing *Whren*, 517 U.S. at 810).) At the June 7, 2016 evidentiary hearing, Trooper Gremillion testified that Mr. Warnock's "driving pattern indicated that he might be impaired, also warranting an investigatory stop." (Ev. Hr'g Tr., Doc 161 at 15.) The Magistrate Judge found this testimony further supported probable cause to stop the U-Haul. (R&R at fn. 17.)

The Court is not persuaded that Trooper Gremillion was concerned about the U-Haul driver's state of sobriety. The actions he undertook in conducting the traffic stop do not illustrate such a concern. Had Trooper Gremillion been worried that the driver was intoxicated he would likely have administered some type of sobriety test and would not have required Mr. Warnock to exit his vehicle on the driver's side, where cars were passing along the highway at high speeds.

Despite this determination, the Court ultimately does not find the stop unlawful for lack of probable cause. Mr. Warnock is correct that no traffic violation is shown in the video of the stop. However, Trooper Gremillion testified that, at the time of the traffic stop, the dash camera for his car did not begin recording until the blue lights on the vehicle had been activated. (Ev. Hr'g. Tr., Doc. 161 at 7,9.) This automatic technology explanation for the lack of recorded infraction is logical, even if the camera could potentially have been activated manually at an earlier point. Further, Defendant has not presented any evidence

to call into question the truthfulness of Trooper Gremillion's testimony regarding the dash-cam technology or to show that Trooper Gremillion was dishonest in his uncontroverted testimony regarding his initial observation of a traffic violation. *U.S. v. Cofield*, 272 F.3d 1303, 1306 (11th Cir. 2001) (finding that district judge is not required to rehear witness testimony when accepting magistrate judge's credibility findings but that district judge generally cannot reject a magistrate judge's credibility determination without rehearing the disputed testimony) (citing *Raddatz*, 447 U.S. at 681 n. 7).

The Court recognizes that Trooper Washington seemingly did not see the violation. (Gov. Ex. A at 14:02; Video Tr., Doc. 239-1 at 1.) However, Trooper Washington may have been looking in a different direction at the time of the violation. Further, as a passenger in an area he was unfamiliar with, Trooper Washington may not have been on alert for traffic violations in the same way Trooper Gremillion was. Trooper Washington did not testify at the original hearing held by the Magistrate Judge on the motion to suppress. Defendant has not asked the Court to hold a supplemental hearing at which Trooper Washington would testify. In any event, as 15 years have passed since the date of the traffic stop, the Court finds that it is highly unlikely that Trooper Washington would have a clear memory concerning Mr. Warnock's navigation of the fog line.

The Eleventh Circuit has held that probable cause exists where the officer has observed the alleged traffic infraction. *U.S. v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008) (holding that officer had probable cause to stop taxicab because

he observed the cab commit a traffic violation when it failed to signal during a lane change); *U.S. v. Wright*, 615 Fed. App'x 565, 566 (11th Cir. 2015) (finding that deputy had probable cause to initiate traffic stop where he observed a tag light violation). Here, Trooper Gremillion had the requisite probable cause to stop based on his observation of the fog-line violations.

Even if Trooper Gremillion was motivated by his interest in monitoring and identifying drug trafficking along I-20, as Defendant suggests, the stop is lawful if he observed a traffic violation. *U.S. v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999) (explaining that the "officer's motive in making traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment.") As the Court has no evidentiary basis upon which to reject Trooper Gremillion's testimony that he saw a traffic infraction, the initial stop was permissible.

### B. The scope and duration of the traffic stop

After stopping Mr. Warnock, the Troopers asked him to exit and step to the rear of the U-Haul. (Gov. Ex. A at 14:03:25.) Over the course of the next few minutes, Trooper Gremillion obtained Mr. Warnock's license and asked him questions regarding his destination, his reasons for traveling, his occupation, his residence, details of the rental U-Haul, and information about his past pit stops. (Gov. Ex. A at 14:04:30 – 14:07:10; Gov. Video Tr. at 3-4.) Just less than five minutes into the stop, Trooper Washington joins in the questioning and asks what Mr. Warnock has in his fanny pack. (Gov. Ex. A at 14:07:11; Gov. Video. Tr.

7

at 5.) As Mr. Warnock lists various items, Trooper Washington reaches forward and begins to rummage through the fanny pack. (*Id.*) After the fanny pack has been searched, the Troopers continue to quiz Mr. Warnock, now with questions about a phone number written on a piece of paper found in the fanny pack. (Gov. Ex A at 14:08:55; Gov. Video Tr. at 7.) Eventually, Trooper Gremillion calls in for a computer check on Mr. Warnock's license and criminal record. (*Id.*)

Mr. Warnock argues that this traffic stop was impermissibly extended beyond its proper duration because the Troopers (1) asked questions outside the scope and unrelated to the reasons for the stop and (2) unlawfully searched Mr. Warnock's fanny pack. (Def. Obj. at 3, 8.)

### i.  Questioning unrelated to the stop

First, Mr. Warnock contends that the stop was unlawfully extended because (a) the questions were unrelated and outside the "mission" of the traffic stop as defined by *Rodriguez v. United States*[8] and because (b) these questions occurred before Trooper Gremillion had contacted the Shreveport Trooper's Office to conduct a license and criminal history check. (Def. Obj. at 11.)

The Magistrate Judge found that the stop was not unreasonably extended because, even if some questions were potentially outside the scope of the stop, "[d]uring the approximately eight minutes between the initial stop and Warnock's consent to search the vehicle. . . 'Trooper Gremillion focused on the reason for the stop and officer safety, both squarely within the mission of the

---

[8] 135 S. Ct. 1615 (2015).

traffic stop.'" (R&R at 25, 26) (citing Gov. Br., Doc 165) (and citing *United States v. Burrows*, 564 F.App'x 486, 491 (11th Cir. 2014); *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).)

Despite Trooper Gremillion's bellicose questioning here, the Court does not find a constitutional violation. It is certainly true that many of the questions asked by the Troopers — about Mr. Warnock's occupation, residence, prior gas station stop, fanny pack contents, and girlfriend — were unrelated to the "mission" of the stop. *See United States v. Macias*, 658 F.3d 509, 518-519 (5th Cir. 2011) (finding that officers exceeded the prescribed limits of traffic stop when they engaged in detailed questioning about matters unrelated to the stop and waited eleven minutes into the stop to run computer checks.[9]). But here, Trooper Gremillion called in the computer check less than six minutes into the stop.[10] (Gov. Ex. A at 14:08:55.) The Court finds no authority to support a determination that officers unreasonably extended a stop where the officers delayed less than six minutes. Consequently, though the questioning involved topics outside the bounds of the stop and was conducted in the tone of a cross-

---

[9] The questions in *Macias* which the court found outside the mission of the stop similarly involved the defendant's employment, whether he had been in legal trouble previously, as well as his and his passenger's personal information. 658 F.3d at 519.

[10] Both the U-Haul and the Troopers' vehicle are stopped at approximately 14:03:13. (Gov. Ex. A.) Trooper Gremillion is heard reading the license plate number to the dispatcher around 14:08:55. (*Id.*) Thus, about five minutes and forty-two seconds passed between the pulling over of the U-Haul and Trooper Gremillion radioing in the license information. Mr. Warnock's contention that "he was detained for at least eight minutes . . . before Gremillion even called in to request a license and criminal history check" is incorrect. (Def. Obj. at 3.)

9

examination, these questions did not "measurably extend the duration of the stop." *Johnson*, 555 U.S. at 333.[11]

### ii. The search of Mr. Warnock's fanny pack

Mr. Warnock next challenges the search of his fanny pack, arguing that Trooper Washington reached into and rummaged around Defendant's fanny pack with no lawful authority to do so — no warrant, no consent, and no reasonable suspicion. (Def. Obj. at 10-11.) Though no incriminating evidence was found inside the fanny pack, Defendant contends that "the search of the fanny pack was illegal and impacts the legality of the troopers' later actions." (*Id.* at 9.)

The R&R does not discuss in detail the legal implications surrounding the search of the fanny pack. The Magistrate Judge explained that "Warnock has not identified any items that were seized from the fanny pack that are the subject of his suppression motion, and since the parties have not discussed any issues regarding the seizure of items from the fanny pack in their post-hearing briefs. . . the Court does not address it any further." (R&R at fn. 10.)

Based on its review of the record, the Court sought to further explore objections relating to the validity of the search of Mr. Warnock's fanny pack and

---

[11] The Court notes that the Troopers also pursued unrelated questions *after* Trooper Gremillion had called in the computer check. Under the circumstances here, this questioning did not unlawfully extend the stop because the Troopers were permitted to ask questions unrelated to the initial reasons for the stop while they waited for the return of the computer check on Mr. Warnock. *United States v. Cantu,* 227 F. App'x 783, 785 (11th Cir. 2007) (explaining that an officer may lawfully ask questions unrelated to the traffic stop while waiting for a computer check or while examining a license); *Arizona v. Johnson,* 555 U.S. 323, 333 (2009) (holding that officer's inquiries into matters unrelated to traffic stop do not convert encounter into unlawful seizure, so long as inquiries do not measurably extend the duration of the stop.). In both of these cases, the court declined to suppress the evidence.

10

thus held a hearing on the legality of this search and its impact on the subsequent search of the U-Haul.[12] (Court Order, Doc. 230.) At this hearing on July 24, 2018, fresh arguments surfaced regarding Mr. Warnock's mention of a knife in his fanny pack.[13] Specifically, about four minutes into the stop, the video depicts Trooper Washington poking Mr. Warnock's fanny pack and asking, "what's all this right here?" (Gov. Ex. A at 14:07:12; Video Tr. at 5.) Mr. Warnock begins to describe the contents of the fanny pack. (*Id.*) Then, as Trooper Washington is reaching towards the fanny pack with both hands, he asks "no weapons?" (*Id.* at 14:07:20; Video Tr. at 5.) Mr. Warnock responds, "No weapons, sir. I have a little knife, but the point on it—" when he is interrupted by Trooper Washington, who proceeds to comb through Mr. Warnock's fanny pack (*Id.* at 14:07:24; Video Tr. at 5.)[14]

Established precedent under the *Terry* doctrine allows a law enforcement officer to "conduct a pat down to find weapons that he reasonably believes or suspects are then in the possession of the person he has accosted." *Ybarra v. Illinois*, 444 U.S. 85, 93-94 (1979). Such a *Terry* frisk, however, is not

---

[12] Counsel for Defendant changed on December 8, 2016 upon Mr. Warnock's request. New counsel raised additional issues regarding the search of Mr. Warnock's fanny pack and the search's implications in Defendant's Objections to the R&R. (Doc. 205.)

[13] This knife was not mentioned in the R&R or in any prior briefing of this case. New counsel for the government first brought the knife to the Court's attention at oral arguments on July 24, 2018.

[14] At the hearing on July 24, 2018, the government played the video of the stop in open court. Because the audio accompanying the video is not clear at all times, the Court requested that the government provide a transcript to the Court. The government has complied with this request. (*See* Video Tr., Doc. 239-1.) The Court has reviewed the audio and accompanying transcript multiple times. Upon review, it is clear that Mr. Warnock does make mention of a knife in his fanny pack. The government is therefore correct regarding the content of the audio.

permissible where there is no reasonable belief that an individual has any weapons on his person. *Id.* at 92-93 (finding that initial frisk of defendant was not constitutionally permissible where there was no indication he possessed a weapon, he made no gestures to indicate intent to commit assault, and he acted generally in a manner not threatening). The scope of a *Terry* frisk must be strictly limited to that which is necessary for the discovery of weapons — if "the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993).

Here, because Mr. Warnock mentioned that he had a knife in his fanny pack, the search was lawful. Considering the above doctrine, Mr. Warnock's verbal disclosure gave Trooper Washington probable cause to search the fanny pack. *Illinois v. Gates*, 462 U.S. 213 (1983) (explaining that probable cause to search is established where the facts and circumstances suggest that an item subject to seizure will be found in the place to be searched). Without Mr. Warnock's mention of the knife, the Court might find Defendant's contention that a constitutional violation occurred here persuasive. However, those are not the circumstances before the Court. Trooper Washington's fanny pack search was lawful and did not impermissibly extend the stop or taint the later search of the U-Haul.

### C. Consent to search the U-Haul

In his final objections, Mr. Warnock contests the Magistrate Judge's conclusion that he voluntarily consented to a search of the U-Haul. (Def. Obj. at 4, 14-18.) Mr. Warnock's consent challenge can be separated into four arguments: (1) the nature of the officers' interaction with him was so coercive that Mr. Warnock felt no choice but to acquiesce to the Troopers' demands to search the U-Haul, rendering the "consent" involuntary; (2) Trooper Washington did not wait for Mr. Warnock to actually give consent before he stepped inside the U-Haul and began searching, tainting any later "consent;" (3) Mr. Warnock attempted to withdraw consent and Trooper Gremillion affirmatively denied him this right; and (4) the Troopers exceeded the scope of any consent that existed when they cut open the sealed containers inside the U-Haul. (Def. Obj. at 15-17.)

With respect to Mr. Warnock's first consent argument, the Magistrate Judge found that consent was voluntary in light of the absence of threats or abuse. (R&R at 31-32.) In support, the Magistrate Judge cited a myriad of cases involving "more coercive circumstances" where consent was found. (*Id.*)

After thorough review of the videotape and transcript, the Court agrees that the atmosphere surrounding the search was not so coercive as to render Defendant's consent void because it was unlawfully obtained. It is true that the Troopers barked questions at Mr. Warnock, who appeared to be viewed as a criminal suspect from the start, rather than as a citizen stopped for a fog-line violation. Yet, Mr. Warnock's consent is clearly verbalized: when asked whether

13

he minds opening the back of the U-Haul, Mr. Warnock replies, "No sir." (Gov. Ex. A at 14:10:21; Video Tr. at 9.). And when asked whether he minds if the officers look inside, he again replies, "No, sir." (Gov. Ex. A at 14:10:40; Tr. at 9.) Though the Troopers' tone and manner is aggressive, they used no physical force, threats, or intimation. As evidenced by the legal authority cited by the Magistrate Judge, more egregious, physical coercion or threats is required for a finding that consent was not voluntary. *See e.g., United States v. Garcia*, 890 F.2d 355, 361 (11th Cir. 1989) (finding consent voluntary where defendant was arrested by numerous officers and officers threatened to obtain search warrant if defendant did not consent).

Mr. Warnock's second consent argument – concerning Trooper Washington entering the back of the U-Haul before obtaining consent to search — was not discussed in the R&R. The Court however is not persuaded by Mr. Warnock's argument on this issue. A review of the video of the stop shows Trooper Washington ask, "[c]an I step up here and look?" at 14:10:40. (Gov. Ex. A.) Trooper Gremillion then asks, one second later, "[y]ou mind if we look in here?" to which Mr. Warnock immediately replies "[n]o, sir." (*Id.* at 14:10:41.) At the time Mr. Warnock gives this reply of consent, Trooper Washington has one foot on the platform behind the back of the truck and one foot on the ground — he is not yet inside the back of the U-Haul. (*Id.*) Based on the Court's full review of the videotape and accompanying transcript, it is apparent that Mr. Warnock vocalized consent prior to Trooper Washington entering the back of the U-Haul.

Mr. Warnock's third consent argument that he attempted to withdraw consent when he told Trooper Gremillion that he "just wanted to get on his way" is also not persuasive. (Gov. Ex. A at 14:13:20; Video Tr. at 12.) An assertion that Mr. Warnock wanted to "get on his way" is not the type of unequivocal language necessary to withdraw consent. *U.S. v. Sanders*, 424 F.3d 768, 774 (8th Cir. 2005) (explaining that intent to withdraw consent must be made by unequivocal act or statement); *Burton v. U.S.*, 657 A.2d 741, 746-747 (D.C. Cir. 1994) ("conduct withdrawing consent must be an act clearly inconsistent with the apparent consent to a search, an unambiguous statement challenging the officer's authority to conduct the search, or some combination of both.").

In his fourth and final consent argument, Mr. Warnock claims that officers exceeded the scope of consent when they cut open the boxes in the back of the U-Haul. The Magistrate Judge determined that the officers did not overstep the consent given because Mr. Warnock never limited the scope of the search, voiced objections to the opening of the boxes, or rescinded his consent in any way. (R&R at 32-33.)

The Court agrees. The standard for measuring the scope of a suspect's consent is that of objective reasonableness — "what would the typical reasonable person have understood by the exchange between officer and suspect?" *Florida v. Jimeno,* 500 U.S. 248, 251 (1991). In *Florida v. Jimeno*, the Supreme Court held that it was objectively reasonable for police to conclude that general consent to search a car for drugs included consent to search containers in the car (there, a

paper bag). *Id.  See also United States v. Martinez*, 949 F.2d 1117, 1119-1120 (11th Cir. 1992) (finding that general consent to a mini-warehouse unit for narcotics included consent to search the locked trunk of a 1949 Dodge coupe that was inside the warehouse).  If consent to search is entirely open-ended (or if a defendant lacks knowledge about what the officer is looking for), a reasonable person has no cause to believe the search will be limited in some way. *United States v. Snow*, 44 F.3d 133, 135 (2d Cir. 1995) ("It is self-evident that a police officer seeking general permission to search a vehicle is looking for evidence of illegal activity.  It is just as obvious that such evidence might be hidden in closed containers.").  Under the facts of this case, the scope of the search was objectively reasonable.  Troopers Gremillion and Washington's request to "look in here" reasonably included the request to open the boxes in the back of the U-Haul.  As Mr. Warnock did not confine the search by telling the Troopers that they did not have his consent to open the boxes, he had "no reason to believe the search [would] be limited in some way." *Snow*, 44 F.3d at 135.

As is the case with many suppression issues involving traffic stops, questionable officer conduct here makes the outcome a close call.  However, the Court has no evidentiary basis upon which to doubt Trooper Gremillion's assertion that he truly observed a traffic infraction.  In addition, neither the multiple unrelated questions asked of Mr. Warnock nor the foray into his fanny pack render any aspect of the stop unlawful under the circumstances.  Some clouds surround the consent given in response to the Troopers' aggressive but

lawful conduct. These concerns, however, are not enough to tip the scales in favor of suppression.[15]

Accordingly, the Court **ADOPTS** the Magistrate Judge's R&R [Doc. 185] **SUBJECT TO THE MODIFICATIONS AND FINDINGS** set forth in this Order and **DENIES** Defendant's Motion to Suppress [Doc. 127]. Trial is hereby set for November 5, 2018, at 9:30 AM in Courtroom 2308. The pretrial conference is set for November 1, 2018 at 10:30 AM in Courtroom 2308. By 3:00 PM on October 25, 2018, the parties are to file any motions in limine and proposed voir dire questions. By 3:00 PM on October 25, 2018, the Government is to file a summary of the indictment for use in voir dire. By 3:00 PM on October 30, 2018, the parties are to file any objections to those items listed above. The time to November 5, 2018, shall be excluded from computation under the Speedy Trial Act pursuant to 18 U.S.C. § 3161(h)(7)(A), (h)(7)(B)(i), and (h)(7)(B)(iv). Failure to grant this continuance would deny counsel for the Government and Mr. Warnock the reasonable time necessary to effectively prepare for trial, taking into account the exercise of due diligence, and would likely result in a miscarriage of justice. The Court finds that the ends of justice are served by granting this continuance and are consistent with both the best interest of the public and individual justice in this matter.

---

[15] The Court's suppression ruling does not by itself determine whether the 2003 stop evidence will be deemed admissible at trial.

**IT IS SO ORDERED** this 11th day of October, 2018.

_____
**Amy Totenberg
United States District Judge**